## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JIM TRAKAS ) | CASE NO: 1:18 CV 1798 |
| ) | |
|     PLAINTIFF ) | JUDGE: Donald Nugent |
| ) | |
| vs. ) | **PLAINTIFF'S BRIEF IN RESONSE TO** |
| ) | **DEFENDANTS' MOTION TO** |
| CONSERVATIVE ALLIANCE ) | **EXCLUDE TESTIMONY OF** |
| POLITICAL ACTION COMMITTEE, et al ) | **JONATHAN PETREA** |
| ) | |
|     DEFENDANTS ) | |
| ) | |

Now comes the Plaintiff, and by and through the undersigned counsel, and does hereby submit to this Court the attached and incorporated Brief in Response to the Defendants' motion to exclude the opinion testimony of Jonathan Petrea. As will be seen from the arguments so following, the position taken by the Defendants' is somewhat "off the mark" and the testimony of Jonathan Petrea is admissible for several purposes as will be discussed. Accordingly, Plaintiff moves this court to deny the Defendants' motion in its entirety including the request for an extension to respond thereto.

Respectfully submitted,

/s/ *David J. Horvath*
David J. Horvath 0055989
7100 E Pleasant Valley Rd.
Suite 110
Independence, OH 44131
216-986-0860
djhorvath@hotmail.com

**SERVICE**
A true and accurate copy of this has been served upon Christopher J. Hogan this 18th day of October, 2019 by way of email at: Hogan@litohio.com, as well as through the electronic filing system of this Court.

/s/ *David J. Horvath*

## Introduction

Almost the entirety of Defendants' argument pertains to the use of Mr. Petrea's report for the establishment of monetary damages resulting from the loss of an election. As stated upon the face of this motion, this singular argument "misses the mark". Jim Trakas primarily brought this action as one in defamation per se. As such Mr. Trakas does not need to prove financial damages in order for a jury to find in his favor. What Defendants fails to appreciate is that the report of Mr. Petrea is not one that is limited to the establishment of monetary damages. Rather, the report itself is intended to be used as evidence of defamation.

Defendants has failed to cite as much as one case that suggests this opinion is precluded as either factual or expert testimony for this particular purpose.

As stated in Defendants' case law, which will be discussed below, it is next to impossible to interview each and every voter within this district to determine whether or not the information circulated changed their vote. This principle is replete in all of the case law cited. This, however, is not the salient point. Furthermore, this antiquated principle is hardly controlling given today's "digital age" where information is so readily accessible and quantifiable (Citation below). The point being made here is that the report clearly shows loss of reputation by way of voting results. It is not a leap of faith to compare pre-publication numbers and relate them to post-publication numbers.

No candidate can afford the cost and effort of surveying each and every member of his or her voting district and ask them if the materials made Mr. Trakas less favorable in their eyes. Thus, as a way of avoiding the obvious cost and effort involved in doing so, and to take advantage of modern methods and techniques, Mr. Trakas hired an election expert to examine polling numbers as they existed before the circulation of the defamatory materials, and after the

circulation of the defamatory materials. This particular data is objective, based upon established political science, and is highly instructive on the issue of whether or not the general reputation and character of Mr. Trakas has been harmed. The opinion is not singularly being used to quantify damages. Even if it were, the case law as cited by Defendants' is not necessarily as persuasive and instructive as Defendants may posit. Rather, the examination that follows clearly shows a more modern trend of analysis.

## Distinguishing Factors in Defendants' Case Law

Defendants immediately jump to the conclusion that *Southwestern Publishing Co. v Horsey* is controlling. However, the court's ruling was limited to the issue on lost wages consequent of a lost election (and not lost reputation). The court did not go so far as to apply this reasoning to the libel claim itself. The topic avoided by Defendants is that the court allowed the question of libel to be treated as a question of fact and not a question of law. Consequently, the matter was remitted to a jury who did award damages in favor of the Plaintiff. It was only upon appeal that the matter received scrutiny. Notwithstanding, it is interesting to note that the Court issued a statement which is quite applicable to the case sub judice. At Page 322 the Court noted that "the law of libel would not be labored here. However, it is enough to say it is an easy way in which the quoted editorial slips without transition from justice *Horsey*'s "I admit I am pro-labor" to "by pro-labor is meant labor racketeers". The Court noted that this purposeful misrepresentation set the stage at the very least for a question of fact which deserved a trial before a jury as to whether or not there was an issue of libel or fair comment (and assumedly damages). *Id*. at Page 322.

Replete within Mr. Trakas's Complaint are references to unfair comment and repeated implications of criminal conduct. For instance at Paragraphs 14 through 17, Mr. Trakas makes

note of such defamatory statements as "enriching himself at our kids' expense" and "overbilling the State of Ohio by $800.000". It is quite obvious that Mr. Trakas did neither of these things and that the Defendants are creating improper inferences. The same is proven by way of Paragraph 19 of the Complaint where Mr. Trakas is alleged to being"backed by corrupt politicians investigated for illegal kickbacks". The additional references of being a **crony and scamming the State of the Ohio** are clearly statements which on their face become matters of fact subject to the holding in *Southwestern Publishing* that presents a question for the jury.

The question is not so topical as to be that of mere opinion or impression. It is one that can and will be resolved with the scientific data supplied by Mr. Petrea. This will be discussed below and in greater detail as it pertains to Rule 702.

Defendants' also rely on *Chrysler Corporation v Todorovich* 580 P. 2d. 1123 (Woy. 1978) in support of the contention that speculative damages in regards to an election just simply are not allowed. In this instance the *Todorovich* Court held it was a reversible error to admit expert testimony relating to the loss of salary resultant of the bid for re-election claiming there were way too many inconsistencies and inaccuracies in a general opinion issued. Again, the testimony was introduced, at least ostensibly, for establishing lost salary.

However, and in 1982 the Fourth District Court of Appeals in California took serious issue with this particular finding. Plaintiff would cite *Fisher v Larsen* 138 Cal. App. 3d. 627 for the specific proposition that "in this modern technological era with increasingly sophisticated polling techniques, we are reluctant to hold, as a matter of law, that there may never be a case in which evidentiary complexities cited in the *Southwestern* decision may not be overcome". *Fisher* at 629. Indeed, and as in this case, we have developed quite sophisticated polling techniques and we must question the hard and fast ruling of *Southwestern* (which is not the law

of the 6th Circuit). The report issued to Defendants, by Mr. Trakas, is a detailed scientific analysis of polling data based upon sophisticated research techniques. In that report there are clear indications that Mr. Trakas enjoyed a significant voter favorability prior to the publication of these materials which was materially affected by not only their publication, by re-publication by his opponent. (See Trakas Affidavit and report of Petrea).

Again, the bulk of Defendants' arguments pertains to the establishment of damages and why courts have been reluctant to allow expert testimony or other instances of conduct in as evidence of financial damages **in the form lost salary**. The focus of these Courts' opinions was as to whether the compensation sought by those Plaintiffs was unduly speculative or based upon conjecture. In this instance Mr. Trakas is presenting the report to show damage to reputation. It is not necessarily and inextricably related to the establishment of pecuniary damages in the form of lost salary and benefits.

Mr. Trakas would also point to a later decision out of Nevada[1], *Nevada Independent Broadcasting Corp. v Allen* 664 P. 2d. 337 (NV 1983) as being instructive on this matter. In this instance a television broadcaster inappropriately accused a political candidate of passing bad checks and question his "honorability". The Supreme Court of Nevada stated that at the time the remarks were made, they were such that they could have injured the candidate's reputation for public office. *Id*. at 341. Consequently, they were actionable as slander per se. *Id*. citing *Devany v Quill* 64 N.Y.S. 2d. 733 (N.Y. App. Div. 1946) for the proposition that defamatory words uttered against a non-incumbent candidate constituted slander per se if the words would tend to cause persons not to vote for that candidate. This rule has been followed by the restatement of torts at Section 573. *Id*. Furthermore, Trakas has alleged that the statements

---

[1] The exact original jurisdiction of the Southwestern Decision.

made against him in these political materials were false. Whether a statement is false is generally a question for the jury. *Id.* citing *Restatement of Torts Section* 617. The report of Mr. Petrea is offered for the purpose of establishing such a scenario. Given the apparent drop in polling numbers, it clearly assists in establishing the question of fact as to whether or not Mr. Trakas's reputation had been harmed, and how his general reputation as a politician has been irrevocable tarnished by these false allegations.

## Regarding Peer

Defendants has made a specific and strong reference to the case of *Peer v Louis* 2008 U.S. Dist. Lexis 38908 for the proposition that "Federal Courts do not sit to award post-election monetary damages to defeated candidates ..." Without conceding this is instructive, and as addressed above, modern technology allows us to look beyond much of the antiquated thought process that has been perfunctorily recited, there are some distinguishing factors in this case which support admission of this report. Specifically at *25 the *Peer* Court noted that *Louis*'s submission of publications to the jury allowed them to make a finding of defamation. The *Peer* Court also acknowledged that it is virtually impossible to poll all of the voters and Defendants notes this on Page 5 of its brief Footnote 2. Given this invertible impossibility, how are we then left to show damage to someone's reputation without the submission of not only the defamatory materials, but some objective quantifiable evidence of their effect. Again, this ruling was limited to whether or not the salary associated with political office was recoverable. **The *Peer* Court let stand the defamation award as it related to reputation within the community**.

Consequently, this case is not instructive on the issue as to whether or not this expert testimony can be submitted as evidence of loss of reputation. As clearly shown by the report the significant drop in polling numbers can only be associated with the publication of these statements. It is

highly instructive to a jury in allowing them to understand the effect of materials not only upon an election process, but upon the reputation of a politician and his ability to pursue future office.

**Regarding Defamation Per Se**

Again, Mr. Trakas's Complaint is replete with allegations that the comments made against him are defamatory per se. A statement is defamatory if it tends to cause harm to the reputation of another and lowers that person in the eyes of the community or deters third persons from associating with him. *Maag v Ill. Coalition for Jobs* 858 N.E. 2d. 967 (Ill. 5 Dist. 2006) citing *Brison v News America Publishing* 672 N.E. 2d. at 1214. The statement may be actable per se if it is defamatory on its face and fits in one of the limited categories outlined by the Courts. *Id*. These categories are: 1) words impugning the commission of a criminal offense; 2) words imputing infection with loathsome communicable disease; 3) words imputing an inability to perform or want of integrity in the discharge of the duties of office or employment; 4) words with prejudice of party or impute lack of ability in his or her trade, profession, or business ... *Id*. If the defamatory statement is actionable per se the Plaintiff need not plead or prove damages as these statements are thought to be so obviously harmful that injury to the Plaintiff's reputation is presumed. *Id*.

On their face the statements that are presented in the exhibits attached hereto clearly attack Mr. Trakas's integrity, honesty, reputation, ability to do his job, and quite frankly accused him of criminal conduct while in office. The report of Mr. Petrea clearly assists us in establishing this fact. As noted above it is impossible for Mr. Trakas to knock on every door in his district and poll each voter as to whether or not they believe these statements effect his reputation. The most efficient and precise way of establishing defamation per se is by use of this report and the significant amount of data used to prepare it.

**Regarding Admissibility**

*Daubert v Merrill Dow Pharmaceuticals Inc.* 113 S.Ct. 2786 is quite instructive but does not work in Defendants' favor as they suggest. Generally speaking, the general acceptance test that was illustrated in *Frye* was superseded by the adoption of the Federal Rules of Evidence. *Daubert* at 2787. Nothing in the Rules as a whole or in the text and drafting history of Rule 702, which specifically governs expert testimony, gives any indication that general acceptance is a necessary precondition to admissibility of scientific evidence. *Id.* **Moreover, such a rigid standard would be at odds with the Rules' liberal thrust in their general approach of relaxing the traditional barriers to opinion testimony.** *Id.* (Emphasis).

Faced with a proffer of expert testimony under Rule 702 the trial judge, pursuant to Rule 104(A), must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issues. *Id.* Many considerations will bear on the inquiry including whether the theory or technique can be tested, whether it has been subjected to peer review in publication, any known error rate in the existence and maintenance of standards in controlling its operation, and whether it has attracted wide spread acceptance within the particular community. *Id.* The inquiry is a flexible one and its focus must be solely on the principles and methodologies, not the conclusions they generate. *Id.* If scientific, technical, or other **specialized knowledge** will assist the trier of fact to understand the evidence or determine a fact and issue, a witness is qualified as an expert. *Id.* (Emphasis).

That these requirements are embodied in Rule 702 is not surprising. Unlike an ordinary witness (See Rule 701) an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation. (*Id. citing* Rule 702 and Rule 703). Presumably this relaxation of the usual requirement of first hand knowledge is premised on an

assumption that the opinion will have a reliable basis in the knowledge and expertise of the expert's discipline. In this instance Mr. Petrea has significant and extensive experience in political science. It is his occupation and sole practice to examine polling results, and to determine factors for rises or drops in polling results during political campaigns. Political campaigns consist of the distribution and publication of materials and statements about opponents. We are then presented with the question of if not Mr. Petrea, then who? How else may we assist a jury in understanding the effect of the statements upon the general reputation of Mr. Trakas but for somebody who is extensively qualified in examination of political campaigns and has been trained in political science. This falls within the standards addressed above. The report is instrumental to having a jury understand how such statements affect an election in general and their "staying power" as a candidate moves forward in his or her career.

According to *United States v Parra* 402 F. 3d. 752 (7th Cir. 2005) expert testimony is admissible if its offered by a witness qualified as an expert by knowledge, skill, experience, training, or education, and if: 1) it is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case. **In addressing *Daubert,* the 7th Circuit noted that in applying this Rule we have recognized that while extensive academic and practical expertise in an area is certainly sufficient to qualify potential witnesses and expert, Rule 702 contemplates admission by such experts whose knowledge is also based upon experience**. *Id*. at 755. (Emphasis). Thus, a Court should consider a proposed expert's full range of **practical experience** as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area. *Id*. citing *United States v Conn* 297 F. 3d. 548 (7th Circ. 2002): further stating that the advisory committee notes to Rule

702 specifically provide that in certain fields experience is **the predominant, if not sole basis for a great deal of reliable expert testimonies**. (Emphasis).

Obviously there may be some limitations for such research, nevertheless, expert testimony drawing on it is not thereby proscribed by *Daubert*. *United States v Simmons* 470 F. 3d. 1115 (5th Cir. 2006). The Trial Court's gate keeping function is a flexible one and expert testimony is often admissible even though multiple *Daubert'* factors **are not satisfied**. *Id.* citing *United States v Norris* 217 F. 3d. 262 (5th Cir. 2000) (Emphasis). This takes into consideration that a diminished methodology precision of such **soft social sciences**. *Id.* at 1123(Emphasis).

The Third Circuit has opined on this principle as well stated that assessments of experts do not need to be demonstrated as correct, only that they are reliable. In re *Paoli RR Yard v PCB Litigation* 35 F. 3d. 717 (3rd. Cir. 1994). In addition, the rejection of expert testimony is the **exception rather than the rule** and the gatekeeper roll of the Trial Court is not intended to serve as a replacement for the adversary system. Advisory committee note to Rule 702 (quoting *United States v 14.38 Acres of Land* 80 F. 3d. 1074 (5th Cir. 1996) (Emphasis). The Court is not to examine the specific qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer specific questions. *Berry v City of Detroit* 25 F. 3d. 1342 (**6th Cir. 1994**). It is therefore for the Trial Court to determine whether the expert's trading and qualifications relate to the subject matter of his testimony and whether that testimony will be helpful to the trier of fact.

In this instance Mr. Petrea has opined quite in the affirmative as to his qualifications to relate his findings to the jury. He used scientific methods, extensive data, and was capable of compiling these into a useable format which would be highly instructive to a jury in determining how Mr. Trakas' general reputation had been harmed by the publication and republication of

these statements. The mere fact that he has not authored books or articles is irrelevant to whether he has training and expertise not only in political science but political campaigning. His report itself is replete with references to same. He notes clearly that he has been operating his own political consulting firm for approximately a decade and has rather precise knowledge of the demographics and voting preferences within Mr. Trakas' district. It is difficult for us to determine anything other than his methods and opinions are reliable and will assist the jury in understanding this rather complex issue. In terms of its gate-keeping function, Mr. Trakas moves this Court to accept the qualifications of Mr. Petrea as falling squarely within the parameters addressed above allowing for its admission.

Defendants have attempted to "unsoften" the recent progression for the admission of expert testimony. This includes arguments at Page 9 pertaining to hard sciences and publications of general acceptance. As addressed above these are simply no longer the standards for the admission of testimony. Furthermore, Mr. Petrea's report does not present findings which are "improper extrapolation", reliant on anecdotal evidence, lack of testing or subjectivity. The "analytical gap" being complained of simply does not exist here. There is simply a temporal relationship between the publication of defamatory statements and the loss of the general public's favor. The report speaks directly to this and does so without any improper extrapolation or assumption of factors outside of those limited to the report's discussion. In fact, the report is replete with examples, instances, and a very thoughtful and thorough examination of voting patterns in District 6.

Defendants also take issue with references to the Ohio Manufactures Association 2018 Guide. What Defendants fails to address is the substance and experience which is apparent upon the face of this document. Not only do the associates have in excess of fifty years combined

experience in the field, but the report provides a quantum of information in terms of voter demographics and the apparent support of major corporations, law firms, and political action committees. Data is in in of itself just that: data. It takes an experienced professional like Mr. Petrea to bring this data into a format that is usable by a trier of fact. The presentation of this OMA report by itself would do nothing to assist jurors in making any factual determination. Mr. Petrea's report is not a hypothesis. It is an opinion based upon empirical data which satisfies the standards of Rule 702 and is therefore admissible.

**Re Extension of Time**

Nothing in the Federal Rules of Civil Procedure provides for the tolling of court imposed limitations periods merely because a litigant filed a motion instead of a response. Defendants had an entire month to procure a report with contrary findings. There is no surprise to Defendants that Plaintiff's report would be in his favor. Rather than have an expert ready to issue a contrary report, they chose to wait until the 11th hour to file a *Daubert* motion. Plaintiff respectfully requests this Court to deny leave to file an expert report.

Respectfully submitted,

/s/ *David J. Horvath*
David J. Horvath 0055989
7100 E Pleasant Valley Rd.
Suite 110
Independence, OH 44131
216-986-0860
djhorvath@hotmail.com

|   |   |   |
|---|---|---|
| STATE OF OHIO | )  ) SS: | AFFIDAVIT OF |
| COUNTY OF CUYAHOGA | ) | JAMES P. TRAKAS |

I James P. Trakas being first duly sworn and cautioned according to law does hereby depose, state, and aver as enumerated hereunder.

1. That I am the Plaintiff in Case No. 1:18 CV 1798.
2. That I have read the Brief in Response to the Defendant's Motion to Exclude the Expert Report of Jonathan Petrea.
3. That I can confirm that the factual allegations made within his Complaint are true in their entirety by this singular statement and without having to reference each and every averment of fact.
4. A particular fact missing from the argument of Defendants is that at the same time an exceedingly similar and likewise defamatory campaign was run against my primary opponent Michael Canty.
5. In my twenty-five years of political experience I have never seen this particular tactic taken: to attack both candidates of an opposing party within a primary.
6. That I have spoken with many constituents within my community about the materials that are attached to this brief in response.
7. Many of my constituents have expressed an absolute change in their opinion for me which is a direct and proximate result in these materials.
8. I can confirm that I have never overbilled the State, been a political crony, engaged in any racketeering or any other type of activities while in political office.
9. That it became an unfortunate event of the general election campaign that these same materials were published by my opponent with verbatim citations from the materials.
10. This required me to retain an attorney and make a cease and desist letter.
11. Therefore, the defamatory materials that were issued by Defendants were republished for the purpose of effecting the general election.

12. That the Defendants were aware that once they interjected these false and defamatory statements into the general public they assumed the risk that such republication could take place.

13. As can be seen by the report of Mr. Petrea my polling numbers continued to decline up and through the general election.

14. Consequently, it is not only the preliminary publication of these materials, but their reuse by a third party which have continued to cause me loss of reputation.

15. That Mr. Petrea's expertise in the political field is unquestioned and he is considered an expert in regional politics. I sought his opinion because he was the best person available who would understand the demographics of the district as well as the voting progressions over the past ten years.

FURTHER AFFIANT SAYETH NAUGHT

_____
James P. Trakas

On ___10-18-19___, 2019 James P. Trakas appeared before me and personally subscribed that the above is his signature and did attest that this affidavit was his free act and deed.

_____
Notary Public

DAVID J. HORVATH, Attorney at Law
Notary Public - State of Ohio
My Commission has no expiration
Sec. 147.03 R.C.

# TAXIN' JIM TRAKAS
# SHOCKING $3 BILLION
# TAX INCREASE



**OH NO!**
TAXIN' JIM TRAKAS...
*NOT AGAIN!*

JIM TRAKAS IS A PERFECT EXAMPLE OF A CAREER POLITICIAN.

TAXIN' JIM TRAKAS LOVES TO CLAIM HE IS FOR LOWER TAXES -- BUT SERVING AS STATE REPRESENTATIVE PREVIOUSLY *HE VOTED TO INCREASE TAXES BY MORE THAN $3 BILLION.*[1]

*THAT'S RIGHT!* RATHER THAN FIND WAYS TO CUT GOVERNMENT SPENDING, *JIM TRAKAS RAISED SALES TAXES BY 20%* - STICKING OHIO'S WORKING FAMILIES WITH $3 BILLION IN HIGHER TAXES.

IF JIM TRAKAS LIED TO US AND RAISED OUR TAXES, HOW CAN OHIO FAMILIES TRUST HIM NOW? *THEY CAN'T!*

# VOTE NO ON TAXIN' TRAKAS
## -- HE COSTS US TOO MUCH!



(1) 2003 Ohio HB 95, https://www.atr.org/ohio-gov-raise-taxes-point-billion-a1308

Paid for by Conservative Alliance PAC Not Authorized by any Candidate or Candidate Committee. (216) 931-0038

3136 Kingsdale Center, PO Box 1136
Upper Arlington, OH 43221

PRSRT STD
US Postage
PAID
Mailworks, Inc

******************SCH 5-DIGIT 44131 FSSC
THE HORVATH FAMILY
6583 HAROLD DR
BRECKSVILLE OH 44141-1525

# JIM TRAKAS DESCRIBING HIS FOR-PROFIT ONLINE CHARTER SCHOOL:

## The Columbus Dispatch

"...this is a cash cow... I'm not sure we're educating anybody."

*March 5, 2016*





# SHAMEFUL JIM TRAKAS: ENRICHING HIMSELF AT OUR KIDS' EXPENSE

"...this is a cash cow... I'm not sure we're educating anybody."

– *Politician Jim Trakas*
*March 5, 2016*



## Jim Trakas is another self-serving politician.

When Jim Trakas took a break from seeking elected office, he served as chairman of the board of an online charter school called Provost Academy. A state audit found that the online learning school OVERBILLED the state of Ohio by $800,000.

**That's $800,000 of your tax dollars lining their pockets!**

What's worse is Trakas knew it. He was secretly recorded describing the school.

But while Trakas was livin' it up on our dime, our kids were left with hopelessness in their education.

**Enriching Himself. Hurting our Kids. Those are the facts About Jim Trakas.**



# VOTE NO ON JIM TRAKAS ON MAY 8TH

PAID FOR BY CONSERVATIVE ALLIANCE PAC / NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATES COMMITTEE / (216) 031-0038

CONSERVATIVE ALLIANCE PAC
3136 KINGSDALE CENTER, P.O. BOX #136
UPPER ARLINGTON, OH 43221

PRSRT STD
US Postage
**PAID**
Stoneridge
Group

******************SCH 5-DIGIT 44131 FSSC
THE HORVATH FAMILY
6583 HAROLD DR
BRECKSVILLE OH 44141-1525



# TAXIN' US HERE, THERE, AND EVERYWHERE

Career politician Jim Trakas has been running for office for more than 20 years. And over that time, Taxin' Trakas has voted to raise our taxes higher and higher.

In 2003, as State Representative, Jim Trakas **voted to raise sales taxes by 20%** - driving up the costs of everything we buy. *(HB 95, 2003)*



Center on
**Budget**
**and Policy**
**Priorities**

**"SOME OF THE LARGEST STATE TAX INCREASES IN THE NATION."**
*(www.cbpp.org, 11/25/2003)*

 **Higher taxes on clothing – YUP!**

 **Higher taxes on gas – YOU BET!** *(HB 87, 2003)*

 **Higher taxes on diapers – ABSOLUTELY!**

**Taxin' Trakas loved hiking our taxes so much that he didn't stop until he racked up $3 BILLION in higher taxes on Ohio families and businesses.** *(HB 95, 2003)*

## $3 BILLION IN HIGHER TAXES. 20% HIKE IN SALES TAXES. TAXIN' TRAKAS COSTS TOO MUCH!

# VOTE ★ ON TAXIN' JIM TRAKAS ON MAY 8TH!

PAID FOR BY CONSERVATIVE ALLIANCE PAC / NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATES COMMITTEE / (216) 931-0038

Conservative Alliance
3136 Kingsdale Center, P.O. Box #136
Upper Arlington, OH 43221

PRSRT STD
U.S. Postage
PAID
Mailworks, Inc.





# LARRY HOUSEHOLDER JIM TRAKAS:

# IN IT FOR THEMSELVES - NOT CUYAHOGA COUNTY.

That's why **Cuyahoga County families can't trust Jim Trakas**. He'll back corrupt Larry Householder and the Columbus insiders, not us.

Paid for by Conservative Alliance PAC. Not Authorized by any Candidate or Candidates Committee. (216) 931-0038

# JIM TRAKAS: BANKROLLED BY THE COLUMBUS SWAMP. OWNED BY THE COLUMBUS SWAMP.

Former Ohio House Speaker Larry Householder was **under investigation by the FBI for taking kickbacks and illegally pocketing campaign contributions.** But just like Hillary Clinton, the FBI let him off the hook.

Now Larry Householder is plotting a political comeback by getting his old crony Jim Trakas back into office as State Representative.

Larry Householder is Jim Trakas' biggest supporter because Trakas will do nothing to stop his agenda — just like Trakas did when he **voted for Householder's $3 billion tax hike!** (HB 95, 2003)

POLITICIAN JIM TRAKAS
IS BEING PROPPED UP BY A CAREER
POLITICAL INSIDER FROM COLUMBUS
WHO WAS INVESTIGATED FOR:

[_] HIJACKING
ELECTIONS

[_] SHADY
FINANCIAL
DEALINGS

[_] KICKBACKS AND
SKIMMING MONEY

[_] TRADING LEGISLATION
FOR CAMPAIGN
CONTRIBUTIONS

*****************SCH 5-DIGIT 44131 FSSC
THE HORVATH FAMILY
6583 HAROLD DR
BRECKSVILLE OH 44141-1525



POLITICIAN JIM TRAKAS
IS BEING PROPPED UP BY A CAREER
POLITICAL INSIDER FROM COLUMBUS
WHO WAS INVESTIGATED FOR:

[ ] HIJACKING
ELECTIONS

[ ] SHADY
FINANCIAL
DEALINGS

[ ] KICKBACKS AND
SKIMMING MONEY

[ ] TRADING LEGISLATION
FOR CAMPAIGN
CONTRIBUTIONS

****************SCH 5-DIGIT 44131 FSSC
THE HORVATH FAMILY
6583 HAROLD DR
BRECKSVILLE OH 44141-1525

# JIM TRAKAS:
## BANKROLLED BY THE COLUMBUS SWAMP.
## OWNED BY THE COLUMBUS SWAMP.

Former Ohio House Speaker Larry Householder was **under investigation by the FBI for taking kickbacks and illegally pocketing campaign contributions.** But just like Hillary Clinton, the FBI let him off the hook.

Now Larry Householder is plotting a political comeback by getting his old crony Jim Trakas back into office as State Representative.

Larry Householder is Jim Trakas' biggest supporter because Trakas will do nothing to stop his agenda - just like Trakas did when he **voted for Householder's $3 billion tax hike!** (HB 95, 2003)

# IN IT FOR THEMSELVES - NOT CUYAHOGA COUNTY.

## LARRY HOUSEHOLDER
## JIM TRAKAS:

That's why **Cuyahoga County families can't trust Jim Trakas.** He'll back corrupt Larry Householder and the Columbus insiders, not us.

Paid for by Conservative Alliance PAC. Not Authorized by any Candidate or Candidates Committee. (216) 931-0038

## MILKING THE TAXPAYER



Jim Trakas has been running for and holding elective office for more than two decades where he has collected hundreds of thousands in taxpayer-funded salary. He even steered a million in tax payer dollars to his charter school, which he called a "cash cow." [1]

## SENDING TAXES SKYROCKETING



Taxin' Jim Trakas officially pledged to never raise taxes, BUT he did! He raised taxes on gas and fees for licenses and registrations by $577 Million and raised the sales tax by 20%. Taxin' Trakas wasn't done until he increased taxes by more than $3 billion. [2]

## WORKING FOR CORRUPT COLUMBUS INSIDERS, NOT US



Jim Trakas' campaign is being backed by the corrupt former Ohio Speaker who was investigated for taking illegal kickbacks and who was investigated by the Feds. Trakas is beholden to him and his interests, not Cuyahoga County families. [3]

# NO JIM TRAKAS

Paid for by Conservative Alliance PAC
Not Authorized by any Candidate or Candidates Committee
(216) 931-0038

(1) Columbus Dispatch, 3/5/16   (2) HB 87, 2003; HB 95, 2003   (3) Cleveland Plain Dealer 3/10/04; Cleveland Plain Dealer 5/22/04

CONSERVATIVE ALLIANCE PAC
3136 KINGSDALE CENTER, P.O. BOX #136
UPPER ARLINGTON, OH 43221

PRSRT STD
US Postage
PAID
Mailworks,
Inc.

*******************SCH 5-DIGIT 44131 FSSC
THE HORVATH FAMILY
6583 HAROLD DR
BRECKSVILLE OH 44141-1525

