**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JIM TRAKAS, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 1:18-cv-1798** |
| | : | |
| v. | : | **Judge Donald C. Nugent** |
| | : | |
| CONSERVATIVE ALLIANCE | : | |
| POLITICAL ACTION COMMITTEE, | : | |
| et al., | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

> *"[A] plaintiff who aspires to ward off a properly documented motion for summary judgment must produce enough proof to enable [his] case to get to a jury. This obligation cannot be satisfied by conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."*

> [Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001).]

CA PAC's Motion advances the clear legal principles that compel dismissal of Plaintiff Trakas' Complaint.  Plaintiff understands this and, thus, resorts to a number of improper tactics – tactics that, fortunately, courts have uniformly held will not ward off summary judgment.  To wit, Plaintiff cannot avoid summary judgment:

- By making arguments that display "a glaring ignorance" of the law and an "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist." Borowski v. DePuy, Inc. 850 F.2d 297, 304-05 (7th Cir. 1988).  Plaintiff ignores the law, offering essentially no response to the legal principles set forth in the Motion.  Those few cases cited in the Memo Contra are used mostly to misstate the law.  Just as one example, *Plaintiff tries to suggest he is not a "public figure" in order to avoid the constitutional malice standard that applies to the fault element of his claim.*

- By advancing "speculation and conjecture." Highland Cap., Inc. v. Franklin Nat'l Bank, 350 F.3d 558, 568 (6th Cir. 2003).  The Memo Contra seeks to draw impermissible inferences and invites the Court to resort to guesswork and speculation to find a triable

issue on the constitutional malice test.  The relevant inquiry is whether the defendant "realized that his statement was false" or whether he "subjectively entertained serious doubt as to the truth of his statement."  Bose Corp. v Consumers Union of U.S. Inc., 466 U.S. 485, 511, n.30 (1983), such that he published it with "a high degree of awareness of … probable falsity."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).  [Motion at 26-27.]  Instead of producing evidence of the state of mind of persons who were involved in preparing and reviewing the challenged advertisements, Plaintiff offers only his inadmissible speculation as to what _he believes_ those persons knew and thought.

- By misrepresenting or rewriting the record.  Even where the Memo Contra does cite the record, many of the citations simply do not support the proposition stated or are, at best, inaccurate.  For example, the challenged advertisements are in the record, but in many instances Plaintiff does not address the actual language and content of the ads.  Rather, he rewrites or recharacterizes statements made and then declare his rewritten statements are false and defamatory.  But "[i]t is not sufficient for a libel plaintiff to show that an interpretation of facts is false[.]"  Jacobs v. Frank, 60 Ohio St. 3d 111, 118-19 (1991).

As detailed below, Plaintiff has failed to satisfy his burden under Rule 56(c) to demonstrate a genuine issue of material fact.  _The bottom line is that Plaintiff is a public figure, and he made no attempt whatsoever to discover, let alone prove, constitutional malice_.  CA PAC is entitled to judgment as a matter of law.

### A. Plaintiff Failed To Sustain His Burden On The Several And Specific Essential Elements Of A Defamation Claim Placed At Issue In The Motion.

Because Plaintiff tries to conflate and create confusion over the elements of a claim for defamation, we will repeat them here:  Plaintiff must prove _each_ of the following:

> (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

> [Am. Chem. Soc'y v. Leadscope, Inc., 133 Ohio St. 3d 366, 389 (2012).]

As a result, "[t]o survive a motion for summary judgment in a libel action, the plaintiff must make a sufficient showing of the existence of every element essential to its case."  Nat'l Medic Services Corp. v. E.W. Scripps Co., 61 Ohio App. 3d 752, 755 (1st Dist. 1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  For purposes of this Motion, CA PAC need only

demonstrate the *absence* of a genuine issue of material fact and an entitlement to judgment as a matter of law on *a single element* of the claim.  The instant Motion does much more than that:  It makes that showing on the *first*, *second*, *fourth*, and *fifth* elements of the claim.

Unable to make the necessary showing under Rule 56, Plaintiff tries to suggest that he can ward off summary judgment by making a lesser showing on as little as one element.  But the case Plaintiff cites for that proposition shows he is wrong.  Plaintiff asserts that Nat'l Medic Services Corp., *supra*, establishes that he "need only prove a prima facie case of falsity in order to take the matter to a jury."  [Memo Contra at 16.]  Wrong.  In that case, only the first element of a claim (a false statement of fact) was placed at issue at summary judgment.  The plaintiffs there failed to meet their burden to show that the challenged statement was false, and the court affirmed summary judgment for the defendants, declaring "no further analysis of the essential elements of defamation is necessary" because the plaintiffs failed to meet their burden on the one element.  61 Ohio App. 3d 755.

Here, Plaintiff fails to make a sufficient showing on all four elements placed at issue in the Motion – although failure on only one compels summary judgment for CA PAC.

**B.**     **Plaintiff Is A Public Figure And, Thus, Cannot Satisfy The Fault Element Of A Defamation Claim Unless He Proves An Actionable Statement Was Made With Constitutional Malice.**

First, we address Plaintiff's attempt to confuse the law by suggesting that the New York Times public-figure constitutional malice standard does not apply to the fault element on his defamation claim.  There can be no dispute that Trakas, a former elected official running again for public office, is a public figure for purposes of defamation law.  The U.S. Supreme Court, held decades ago that a candidate for public office is a "public figure," and, therefore, "publications concerning candidates must be accorded at least as much protection under the First

and Fourteenth Amendments as those concerning occupants of public office." Monitor Patriot Co. v. Roy, 401 U.S. 265, 271 (1970). [Motion at 5.] Constitutional malice is the standard.[1]

Yet at pages 7-8 of the Memo Contra, Trakas tries to cast doubt as to whether the constitutional malice standard applies here. First he purports to offer a block quote from Monitor Patriot Co. and then tries to suggest the Supreme Court somehow drew a line between statements about office-holders or candidates that are protected under the New York Times v. Sullivan standard and those that are not. *Wrong on both counts*. First, the block quote is obviously not even from Monitor Patriot Co.; rather, it is from some unidentified source referencing Monitor, so it is unclear what point Plaintiff is trying to make. Moreover, second, the unidentified quote cites to a section of the Monitor opinion in which the Supreme Court explained that its decisions following New York Times make clear that the First Amendment draws *no distinction* between statements about an office-holder or candidate's "public" conduct and "private" conduct, and both types of statements are subject to the constitutional malice standard. See Monitor, 401 U.S. at 272-77. In short, Trakas' suggestion that a lesser standard applies to the fault element is false.

---

[1] See also Henderson v. Caulitz, 644 F.2d 885 (Table), 1981 U.S. App. LEXIS 21242, at *5 (6th Cir. 1981) (affirming summary judgment, court held candidate for school board was a public figure and failed to present evidence the defendants acted with actual malice); Mangual v. Rotger-Sabat, 317 F.3d 45, 66 (1st Cir. 2003) (holding "political candidates unquestionably" are public figures for purposes of actual malice standard); Brown v. Herald Co., Inc., 560 F. Supp. 123, 124 (E.D. Mo. 1982 (granting summary judgment to defendant under actual malice standard, court noted "[a]t the time of publication plaintiff was a public official or public figure in that he was a candidate for the elective public office of Sheriff of the City of St. Louis, Missouri"); Cruxton v. Taylor, 1982 Ohio App. LEXIS 13468, at *15 (Ohio Ct. App. 8th Dist., Apr. 1, 1982) (applying actual malice standard to defamation claim brought by city council candidate, noting it is "well-established that the rule applies to candidates for public office").

**C.    Plaintiff Cannot Establish A Defamation Claim Based His Own Imaginative Rewriting Of The Challenged Advertisements, Rather Than On The Actual Statements Contained In The Ads.**

In moving for summary judgment, we identified the specific statements challenged in the Complaint and offered an analysis of each statement in context of each advertisement as a whole and applicable case law on defamation and the First Amendment.  [Motion at 6-14.]  In a nutshell, the settled law that Trakas fails to address in his Memo Contra is as follows:

- Under the absolute protections for statements of opinion contained in the U.S. and Ohio constitutions, the central inquiry is whether, under a reasonable-person test considering the totality of the circumstances, an average or ordinary person would believe the statement to be an opinion – *i.e.,* a statement that lacks a plausible method of verification, rather than a statement of fact, which can be verified.  See, e.g., Milkovich v. Lorain Morning Journal Co., 497 U.S. 1, 20 (1990); Vail v. Plain Dealer Publ'g Co., 72 Ohio St. 3d 279, 281 (1995); Scott v. News-Herald, 25 Ohio St. 3d 243, 250 (1986).  The Motion identifies and discusses the specific statements that are subject to protection as statements of opinion, rather than objective fact.

- As for statements of fact, under the "substantial truth" doctrine, "[i]t is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation."  Nat'l Medic Services Corp., *supra*, 61 Ohio App. 3d at 755.  The Motion discusses the specific statements challenged in this lawsuit that are statements of fact and, thus, are protected speech because they are either true or substantially true.

Instead of analyzing the actual statements made in the advertisements, however, Trakas offers the Court his attempted rewrites.  Here are just a few examples:

- Trakas asserts that an advertisement focusing on his involvement with troubled charter schools [Marston decl. Exh. A-1] "makes direct reference to ownership in Provost Academy's Operating company, EdisonLearning Company" and "Mr. Trakas had no ownership in EdisonLearning."  [Memo Contra at 2.]  The ad, however, makes no mention of Trakas' ownership or non-ownership of the school's operating company.  Rather, it focuses on financial misconduct that occurred at Provost Academy while he was chairman of the school board.

- The same ad stated "[t]hat's $800,000 of our tax dollars lining *their* pockets," (emphasis added), immediately after the sentence "[a] state audit found that the online learning school OVERBILLED the state of Ohio by $800,000."  The word *their* clearly refers to the school, which is the subject of the sentence that it follows.  Thus, this is not a statement about Trakas.  In his Complaint, however, Trakas rewrote the statement and

represented to the Court that the ad said "[t]hat's $800,000 of our tax dollars lining *his* pockets" (emphasis added).  When we called him out on his misquote, Trakas tried to brush it off as a "modest rephrasing."  Undaunted, he asserts the Court should find his rewrite is actionable – that the word *their* means *his*.  [Memo Contra at 6, 7, 16, 18.]

● Another ad [Marston decl. Exh. A-4] criticized him for voting for a major tax increase after claiming he was for lower taxes.  Trakas claims the ad made a factual statement that he "lied to us" and that it called him a "liar."  [Memo Contra at 3, 21.]  Not so.  The ad contained an opinion statement, framed as a question, that, "*If Jim Trakas lied to us and raised our taxes*, how Ohio families trust him now?  They can't!" (Emphasis added).[2]

In short, Trakas cannot rewrite or recharacterize the statements made and then declare his rewritten statements are defamatory.  As the Ohio Supreme Court held, "[i]t is not sufficient for a libel plaintiff to show that an interpretation of facts is false[.]"  Jacobs v. Frank, 60 Ohio St. 3d 111, 118-19 (1991).  Thus, the Court should reject Trakas' tactic of offering *his interpretations* of the challenged statements and then declaring *his interpretations* "false and defamatory." Similarly, even if Trakas could manufacture multiple interpretations, CA PAC is entitled to the benefit of the "innocent construction rule."  That rule, which goes to the second element of a claim, holds that "if allegedly defamatory words are susceptible to two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted."  Yeager v. Local Union 20, 6 Ohio St. 3d 369, 372 (1983).  Trakas cannot contend that his *rewrites* of the ads demonstrate that the ads are defamatory.[3]

---

[2]     As the Sixth Circuit noted, "it is generally settled as a matter of defamation law ... that a question, however embarrassing or unpleasant to its subject, is not [an] accusation."  Boulger v. Woods, 917 F.3d 471, 480 (6th Cir. 2019) (internal citations omitted) (applying factors from Scott v. News Herald to hold question posed by defendant was protected opinion).

[3]     At pages 15-16 of the Memo Contra, Trakas argues that the innocent construction rule does not apply here.  This is a deflection tactic, given that the innocent construction rule is not mentioned in the Motion.  But by rewriting the actual statements made in the ads, Trakas has made this rule relevant:  To rephrase the rule, if an allegedly defamatory statement is susceptible to two meanings, one being the defamatory meaning attaching to Trakas' recharacterization or rewrite of the statement and the other being the nondefamatory meaning of the actual statement, the defamatory meaning should be rejected and the nondefamatory meaning adopted.

**D.    Opinions Expressed In The Ads Are Not Actionable Because Statements Of Opinion – Particularly Political Opinions Expressed During An Election – Are Constitutionally Protected Speech.**

Most of the statements targeted in the Complaint are nonactionable statements of opinion. The federal Constitution provides full protection for statements of opinion, which are described more precisely as "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." Milkovich v. Lorain Morning Journal Co., 497 U.S. 1, 20 (1990).  The Ohio Constitution "provides a separate and independent guarantee for protection of opinion." Vail v. Plain Dealer Publ'g Co., 72 Ohio St. 3d 279, 281 (1995).  [Motion at 6-7.]

Trakas tries to suggest that statements of opinion are not protected unless they contain some type of prefatory language, such as "in my opinion."  [Memo Contra at 3, 4.]  No authority is offered for this assertion, which has no support in the case law cited here and in the Motion. Trakas also asserts that statements or arguments made in CA PAC's brief and statements by Attorney Tyrrell in his declaration show "actual malice," but that is a red herring:  *The only statements at issue on this claim for defamation are those statements published in the challenged political advertisements*.  So, let us return to the actual statements placed at issue – the statements in the ads – and the support for those statements found in the factual sources available to the persons involved in publishing the ads.

● **Statements pertaining to Trakas' activities with troubled charter schools.**

First, many of the statements contained in the political ad directed at Trakas' involvement with charter schools referencing Trakas as "shameful," "enriching himself at our kids' expense," or "livin' it up on our dime" while "our kids were left with hopelessness in their education" are statements of opinion based on factual matters.  [Marston decl. Exh. A-1; Motion at 7-8.]

7

Statements regarding Trakas being "enriched" in connection with his involvement with troubled charter schools are supported by news coverage available at the time to those who prepared the ads.  This includes an opinion column written by Stephen Dyer, a former Ohio House member and an education policy fellow with Innovation Ohio, who wrote about an amicus brief signed by Trakas and several other former legislators in support of the online charter school Electronic Classroom of Tomorrow ("ECOT") in its dispute with the Ohio Department of Education over state funding.  This column, published by the Highland County Press on October 25, 2017, under the headline "Former Ohio GOP legislators: Pay schools even if kids aren't there," stated in part:

> Well, it's come to this: Former Ohio legislators are now telling the Ohio Supreme Court that the state should pay schools for kids the schools say[ ] are there, even if they really aren't.
>
> The filing was made on behalf of five former Republican members of the Ohio General Assembly earlier this month in a case that could well determine the very existence of Ohio's largest virtual school and the nation's largest dropout factory.
>
> Does it surprise you that these legislators (according to Follow the Money https://www.followthemoney.org) have received more than $50,000 in campaign contributions from Electronic Classroom of Tomorrow founder William Lager, and nearly $135,000 total from Lager and David Brennan – Ohio's charter school Godfather?
>
> In fact, the lead legislator on the filing is William Batchelder one of the longest serving state legislators in history who was Brennan's bag man on Ohio's school voucher legislation in the mid-1990s.
>
> Batchelder left the Ohio Legislature in 2014. Shortly after that, he fell into a new job – lobbying for Bill Lager. Makes sense.  Lager had paid him $45,000 (not to mention the tens of thousands he paid to the Ohio House Republican Caucus during Batchelder's time as Speaker of the House). Batchelder collected $67,000 from Brennan, and even more if you include Brennan's wife, Ann.
>
> The second legislator named is Chuck Calvert, who left the Legislature the year I was elected, so I never really knew him. But he was the powerful

8

chairman of the House Finance Committee for years.  He collected $6,000 each from Lager and Brennan.

Then there's Mike Glib – a lawmaker from northwest Ohio who took $4,000 from Brennan.

*Jim Trakas is next, who collected $5,000 from Brennan and is now running dropout recovery schools in Cleveland that graduated 26 of 142 possible students last year.*

> [Tyrrell decl. Exh. B-7 (news clipping) & B-10 (reprint in Takas opposition report, pp. 30-31) (emphasis added).]

The coverage also includes an October 22, 2017, <u>Columbus Dispatch</u> report ("Ex-GOP lawmakers assist ECOT") on the filing of the amicus brief, which noted that the brief "does not mention that Trakas is – or at least was this summer – ECOT's director of community school advancement and is currently registered as [ECOT founder William] Lager's lobbyist.  It also doesn't mention that he was board chairman of Provost Academy, the online charter school whose poor attendance records first prompted the Department of Education to beef up its enrollment validation process."  [Tyrrell decl. Exh. B-8 (clipping) & B-10 (opposition report pp. 19-20).]  And, of course, the ad specifically cites the <u>Columbus Dispatch</u> article that quotes Trakas as saying Provost Academy "is a cash cow … .  I'm not sure we're educating anybody."  [Marston decl. Exh. A-1.]

As noted above, Trakas cannot ward off summary judgment by rewriting the ad by, for example, claiming the ad made "direct reference to ownership" of Provost's operating company when it didn't, or that the ad said "that's $800,000 lining his pockets," when it didn't.

Similarly, he argues that the statements that he was not "enriched," etc., are "false" because he was paid only $75 to $125 for each Provost Academy board meeting he attended.  [Memo Contra at 2, 14.]  Of course, some voters might think being paid $75 to $125 to attend board meetings of a dysfunctional school that overbilled the state by hundreds of thousands of

dollars is "enrichment" of some sort.  But in any event, these are statements that fall within the category of protected opinion because these constitute "hype" or language that has no "readily ascertainable meaning or is ambiguous."  Vail, 72 Ohio St. 3d at 282-83.

Moreover, Trakas' contention that his board stipends are the only emoluments he received from charter schools ignores his extensive involvement with troubled charter schools and his role – as reported by reputable sources – that Trakas held a position with ECOT, was a lobbyist for ECOT's founder, he received money from another charter-school founder, and was running dropout-recovery charter schools that showed poor results.  Trakas also tries to rewrite the charter school ad to claim the ad "made it clear" that he was "involved with illegal kickbacks, and engaged in other crony activities supporting criminal activity."  [Memo Contra at 11.]  *But this ad made no reference* to criminal activity or illegal kickbacks, and it did not contain the word *crony*.  It also accurately stated – as reported by reputable news organizations – that a state audit found Provost Academy had "overbilled" the state by $800,000.[4]

---

[4]  Regarding the line in the charter-school ad that stated "[e]nriching Himself.  Hurting our Kids.  These are the facts about Jim Trakas," Plaintiff asserts that the remark that "these are the facts" "obviates any argument that this particular advertisement contains opinion."  [Memo Contra at 3.]  Plaintiff cites no authority for this proposition.  The case law regarding opinion statements, however, indicates that regardless of whether statements are accompanied by prefatory statements such as "this is my opinion" or "these are the facts," courts look to the actual meaning of the words used and nevertheless use the "totality of the circumstances" test to determine whether challenged statements have a "readily ascertainable meaning" that is factual or not.  Vail, 72 Ohio St. 3d at 282-83.  We also note that Plaintiff claims it was "false" to state that a Department of Education audit found the school had overbilled the state by $800,000, because he claims that the state later reduced the amount to $200,000.  [Memo Contra at 16; Trakas aff'd ¶ 16.]  Plaintiff cites no public information source and does not provide the date when that occurred.  In any event, where a publisher relied on information from reputable sources and had no strong reason to doubt the accuracy of the sources, the publisher has no duty to personally investigate and may rely on the sources.  See, e.g., St. Amant v. Thompson, 390 U.S. 727, 733 (1968) (holding constitutional malice cannot be proved by showing that the defendant failed to investigate the truth of a statement).  Moreover, a publisher can make a careless error of fact, but that is not actionable:  The standard is actual malice, not whether the

10

● **Statements concerning Trakas' ties to Larry Householder.**

Next, with regard to certain statements in two ads pertaining to Householder's having been under federal investigation for questionable conduct in public office and Trakas' association with Householder during the 2018 primary campaign, most of the statements were about Householder, not Trakas, and, thus are not actionable by him. [Motion, at 8-9.] Instead, Trakas attempts a deflection tactic and tries to suggest that is somehow false or defamatory to associate him with Householder. Trakas asserts that he had "very little actual association" with Householder during the time frame Householder was under federal investigation in 2004-06. [Memo Contra at 3; see also id. at 2, 5, 12, & 17.] Irrespective of the level of Trakas' "actual association" with Householder in 2004-06, or his association in the pre-2002 time period when he and Householder were in the House leadership together, the ads made the point that Trakas was aligned with Householder *in the 2018 primary election*. See, e.g., Marston Exh. A-2 (stating Trakas' 2018 "campaign is being backed by" Householder). Plaintiff does not deny that Householder supported his campaign in 2018, which is not only undeniable but well reported. [Motion at 9.]

As for the reference to Trakas as a "crony" of Householder, Trakas has no answer for the case law we advanced which holds that, in the context of electoral politics, describing someone as a "crony" of a politician whose conduct is open to criticism is a nonactionable statement of opinion because it is a statement whose veracity cannot be proven or disproven. [Motion, at 9-10.] In this context, contrary to Trakas' contention at page 14 of the Memo Contra, "crony" is not a statement of fact that can be proven "false."

defendant was negligent in believing a statement to be true. See, e.g., Garrison v. Louisiana, 379 U.S. 64, 79 (1964).

Trakas nevertheless cites <u>Vail v. Plain Dealer</u>, *supra*, and argues that "where alleged statements tied one to a political regime are sufficiently odious, infamous, or ridiculous, a Complaint has properly stated a cause of action for defamation." [Memo Contra at 13] The citation to <u>Vail</u> is a mystery, as the Supreme Court's opinion does not contain that quote and that case did not involve plaintiff being labeled a crony or any other statements about the plaintiff's ties to another politician.

This proposition about association with odious or infamous persons is found, however, in <u>Jankovic v. Int'l Crisis Group</u>, 494 F.2d 1080 (D.C. Cir. 2007), which Trakas also cites, but that case does not change the above analysis. <u>Jankovic</u> stands for the proposition that statements associating the plaintiff with an odious or infamous person *can be* deemed defamatory. There, the court considered the defendant's written report identifying the plaintiff as the owner of a "crony company" associated with the regime of Serbian leader Slobodan Milosevic. Given that Milosevic was tried as a war criminal who was involved in the murders of thousands of people, the court held that a description of plaintiff as a businessman associated with the Milosevic regime, if false, could be actionable as defamation. <u>Id.</u> at 1091. In a later decision in that litigation, however, the D.C. Circuit affirmed summary judgment for the defendant and indicated that whether a statement labeling someone as a "crony," "ally," or some synonym, is defamatory turns on the infamy of the person being associated with the plaintiff – not on the word that is used. The court did not even rule whether "crony" was defamatory in that context.[5] In sum, the Milosevic case has no relevance to statements concerning Trakas' association with Householder.

---

[5]    See <u>Jankovic v. Int'l Crisis Group</u>, 822 F.3d 576 (D.C. Cir. 2016) (affirming summary judgment for the defendant). Without reaching the issue of whether the word "crony" was defamatory in and of itself, the court found for the defendant based on the lack of actual malice, inasmuch as the plaintiff "failed to establish that 'the defendant actually possessed subjective doubt' about the statement published" regarding plaintiff's ownership of a "crony company." <u>Id.</u>

●  **A heading that said "he scammed us."**

Trakas alleges he was defamed by a headline ("He scammed us before, now he wants to do it again!") in one of the ads [Marston decl. Exh. A-2] and asserts this headline "intimat[es] he is guilty of criminal activity."  [Compl. ¶ 21.]  To the contrary, as we explained, neither the headline nor the items under it make any mention of criminal activity.  [Motion at 10-11.]  In the Memo Contra at page 7, Trakas does not repeat this allegation but instead argues that the "scammed us" statement is false because "[h]e voted for a sales tax increase that was part of a budget bill," and that does not constitute a " 'scam' on the taxpayers.' "  In other words – he reversed course and went back on his previously stated public position, which is something politicians are criticized about every day of the week.

Although Trakas still takes issue with the word *scam*, he offers no answer to the case law we cited holding that *scam* is a protected statement of opinion.  See, e.g., McCabe v. Rattiner, 814 F.2d 839, 842 (1st Cir. 1987) ("[T]he word 'scam' does not have a precise meaning. … While some connotations of the word may encompass criminal behavior, others do not.  The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false.").

Lastly, we revisit Trakas' misleading characterization of the other ad that referenced his voting for a tax increase, reversing his earlier anti-tax stance.  [Marston Exh. A-4.]  This is the ad that Trakas misquoted as saying Trakas "lied to us," whereas the ad actually stated that, "[i]f Jim Trakas lied to us and raised our taxes, how Ohio families trust him now?  They can't!"  Vail,

_____

at 597.  The court noted that after discovery concluded, plaintiff produced no evidence "that there were obvious reasons" for the writer of the report to doubt his conclusion, based on the sources consulted, that the plaintiff "was allied with the Milosevic regime" – and, thus, could be accurately described as a "crony."  Id.  Here, as well, Trakas presents no evidence that those who prepared and reviewed the challenged ads had reason to doubt that Trakas was allied with Householder.  Indeed, there was ample factual basis for that.  [See Tyrrell decl. ¶ 12 & Exh. B-9; Everhart decl. ¶ 4.

*supra*, is again on point.  There, the Supreme Court held that in the context of a highly critical political commentary about a candidate, the speaker's "veiled characterization of [the candidate] as a liar" constituted a protected statement of opinion, as "we conclude this single phrase is insufficient to overcome the conclusion that an ordinary reader would believe that statement, just as the others, to be the opinion of the writer."  72 Ohio St. 3d at 283.  So, too, here, no one reading a toughly worded political ad would read this rhetorical question as a statement of fact.

Thus for the reasons stated in the Motion and above, CA PAC is entitled to summary judgment to the extent the claim is based on such statements of opinion.

E.      **Factual Statements In The Challenged Ads Are Not Actionable Because They Are Literally True Or Substantially True.**

While most of the challenged statements in this case are protected statements of opinion, the challenged factual statements made in the ads are not "false statements of fact" under the first element of a defamation claim because they are either literally true or at the very least substantially true.  [Motion at 13-14.]  As discussed in the Motion and referenced above, the following statements are factually accurate and are consistent with information from reliable news reports:

- The statement that a state audit found that the charter school of which Trakas was chairman of the board overbilled the state by $800,000.  [Marston Exh. A-1.]  As noted, regardless of whether the phrase "[t]hat's $800,000 of our tax dollars lining their pockets." is deemed part of a factual statement or an opinion, this is a statement about the school, not Trakas, and, thus, not actionable.

- Statements about Householder having been the subject of a federal investigation.  [Marston Exhs. A2, A-3.]  Takas counters that Householder was "absolutely vindicated" and "cleared of any criminal activity."  [Memo Contra at 11, 17.]  The ads did not say Householder was charged or convicted, however – just that he was investigated, which is literally true.

14

In sum, the truth or substantial truth of the statements made negates the first element of a defamation claim – that a *false* statement of fact was made.  CA PAC entitled to summary judgment to the extent the claim is based on such factual statements.

**F.    Alternatively, Even If Statements Made In The Ads Were Inaccurate, They Are Protected Under The Constitutional Malice Standard.**

**1.    There Is No Evidence Of Constitutional Malice In This Case.**

The New York Times constitutional malice standard is a *subjective test*, and lack of evidence of constitutional malice negates the fifth element of a claim – fault.  A plaintiff has burden of proving that the challenged publication was "made with knowledge that it was false or with reckless disregard for its truth or falsity," which means "plaintiff must prove with convincing clarity that the defendant had a high degree of awareness of the probable falsity of the published statements."  Jacobs v. Frank, 60 Ohio St. 3d 111, 115 (1991).

The Motion sets forth the declarations of Mr. Marston, CA PAC's Treasurer, and Mr. Everhart, who was involved in preparing the ads, and both stated they knew of no reason to believe statements in the ads were inaccurate.  Further, attorney Tyrrell, who provided pre-publication review, stated that he found that the statements were supported by reliable news reports published by reputable news outlets.  [Motion at 14-15.]

**2.    Constitutional Malice Is Not Established By Speculation About A Person's State Of Mind Or Urging The Court To Make Improper Inferences.**

**a.    Speculation About What Persons Involved In Preparing The Ads Supposedly Thought Is No Substitute For Discovery Into Whether They Knew Statements Were False Or Had Reckless Disregard For Truth Or Falsity.**

Despite his burden to demonstrate constitutional malice, Plaintiff made no more than a perfunctory effort to discover what anyone working on behalf of CA PAC knew or subjectively

believed about the truth of published statements.  Plaintiff knew of Mr. Marston's position as Treasurer of CA PAC because he referenced Mr. Marston in the Complaint.  He knew Mr. Everhart was involved in preparing the ads, because he served a record subpoena on Mr. Everhart's political consulting company.  [See Exh. A (Hogan decl.) & Exh. 1 (subpoena).]  He knew of Attorney Tyrrell's involvement in reviewing the ads – this was disclosed in multiple responses served by CA PAC on March 15, 2019, to Plaintiff's interrogatories.  [Id. Exh. 2.]

Thus, Plaintiff he knew of persons from whom he could seek discovery on constitutional malice – which in this type of case typically necessitates _taking depositions_ of those who participated in publishing the alleged defamation.   Yet Plaintiff made no such attempt and offers _no evidence_, just his and his counsel's inadmissible speculation about what others supposedly knew or their state of mind, to rebut the declarations attached to the Motion for Summary Judgment.  [Memo Contra at 3, 4, 11-12, 14 (citing Plaintiff's affidavit).]

### b.    Plaintiff's Allegations Of Ill Will, "Hatred," Etc., Even If True, Do Not Establish Constitutional Malice.

Plaintiff compounds his inadmissible assumptions about Mr. Everhart's state of mind by asserting – on nothing more than his own say-so – that Everhart "harbored great malice" toward Plaintiff and that he and CA PAC "worked at the direction" of former House Speaker Cliff Rosenberger and Rep. Ryan Smith, Householder's rival for the speakership in 2018, who both "despised" Householder, and had "hatred … to anyone who opposed Smith's bid for Ohio House speaker."  [See Trakas aff'd ¶¶ 35-42.]

But _even if_ Plaintiff could a prove that a publication was motivated by personal "malice" or "hatred," that is irrelevant to this defamation claim – such states of  mind are not evidence of constitutional malice.  The Ohio Supreme Court explained that constitutional malice cannot be confused with common law malice, such as "evidence of ill will, spite, or ulterior motive."

<u>Jacobs</u>, 60 Ohio St. 3d at 115.  <u>See also</u> <u>Rosenbloom v. Metromedia, Inc.</u>, 403 U.S. 29, 52 n.18 (1971) ("[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard); <u>Beckley Newspapers Corp. v. Hanks</u>, 389 U.S. 81, 82 (1967) (holding publication "with bad or corrupt motive," or "from personal spite, ill will or a desire to injure plaintiff" does not rise to constitutional malice).

### c. Constitutional Malice Cannot Be Inferred Or Implied From The Face Of A Challenged Publication.

Plaintiff is also wrong that constitutional malice can be inferred as a matter of law from the face of the challenged ads.  <u>New York Times v. Sullivan</u> "refuted the idea that actual malice could be implied from the character and content of a publication."  <u>Jacobs</u>, 60 Ohio St. 3d at 118-19.  [Memo Contra at 7-10.]

Plaintiff misrepresents <u>McKimm v. Ohio Elections Comm'n</u>, 89 Ohio St. 3d 138 (2000), *supra*, to try to make it appear that the Supreme Court stated that, as Plaintiff put it, "a finding of malice via reckless disregard," may be inferred from the impression that the challenged statement made on a reasonable reader as determined by the court's review of the statement.  But at the page cited for that contention – page 144 of the opinion – *the Supreme Court was not discussing the constitutional malice standard*.  Rather, it was discussing the process by which a court decides as a matter of law *whether a statement is defamatory* without regard to the subjective belief of either the plaintiff or the defendant on that element.  As the court noted, *whether the defendant thought the statement was defamatory or not is irrelevant to the inquiry on this element* because "courts assess the meaning of an allegedly libelous statement from the perspective of the reasonable reader – not from the perspective of the publisher of the statement." 89 Ohio St. 3d at 144.  Whether a statement is defamatory goes to the second element of a claim – not to the fault element.

The Supreme Court's discussion regarding proof of constitutional malice (the fault element) is found at pages 147 to 149 of the opinion – a different section from the one Plaintiff cites – and it noted that the Elections Commission's finding of actual malice in that case was based on the defendant's "testimony before the commission," which demonstrated that "McKimm *intended* to convey to [ ] voters the false message that the drawing *did* convey to the reasonable reader of his brochure." Id. at 148-49 (italics in original). This drives home the point made above – if there is constitutional malice, evidence of such is established *through the defendant's testimony*, not plaintiff's speculation.

> **d.  The Fact That CA PAC Had An Attorney Review The Ads Is Not Evidence From Which Constitutional Malice May Be Inferred; Indeed, It Supports The Opposite Conclusion.**

Evidence in support of *the absence* of constitutional malice is found in the fact that CA PAC engaged Attorney Tyrrell to provide pre-publication review of each of the advertisements. [Motion at 16.] Trakas tries to turn this on its ear by speculating about what he contends would have been "well known" to Attorney Tyrrell about the federal investigation of Householder, accusing Tyrrell of "being disingenuous," and accusing CA PAC, with no evidentiary support, of hiring an attorney in order to do a "whitewash." [Memo Contra at 5-6, 18-19.] Thus, at page 19 of the Memo Contra, Plaintiff urges the Court "to infer" from the fact that Tyrrell was engaged to provide pre-publication review that "Defendants knew" the challenged ads "were patently false and deceptive." Making a factually unsupported inference that a party's seeking legal review is evidence of constitutional malice, however, would be improper on multiple levels.

Plaintiff doth protest too much. Aside from the fact that the ads made no misstatements about the federal investigation of Householder, Plaintiff's speculation about Tyrrell's state of mind is irrelevant and inadmissible. If Plaintiff wanted to learn more about Attorney Tyrrell's

role, his knowledge, and his review of the advertisements, Plaintiff had an opportunity to depose him but Plaintiff chose not to (see above).[6]  After learning of Attorney Tyrell's role last March when he was identified in discovery responses, Plaintiff also made *no attempt* to seek discovery of communications between CA PAC and Attorney Tyrrell.

>        **e.**        **The Alleged State Of Mind Of CA PAC's Litigation Counsel Is Irrelevant To This Case.**

Finally, at paragraphs 23-39 in his affidavit, Plaintiff tries to suggest that the undersigned litigation counsel "should know" certain statements made in the CA PAC ad concerning Provost Academy were "false" because he worked with them in submitting the above-referenced amicus brief on behalf of ECOT in 2017.  [See section D, *supra*.]  Let's be clear:  The undersigned counsel did not represent CA PAC and had no involvement with it before being engaged to defend this lawsuit filed by Plaintiff on July 24, 2018, and Plaintiff offers no evidence to suggest otherwise.  Plaintiff also falsely states at paragraph 29 of his affidavit that Attorney Hogan provided a "sworn statement that is in conflict with what he knew to be true about me and the entire Provost Academy matter."  Attorney Hogan never provided a "sworn statement" about Plaintiff in this or any other forum.  In short, whatever litigation counsel "knew" or "should know" has no relevance to this case, including as to the state of mind of those involved in the publication of the CA PAC ads.

>        **G.**        **Alternatively, CA PAC Is Entitled To Summary Judgment Because Plaintiff Cannot Establish The Required Element Of Damages Proximately Caused.**

The only specific damages that Plaintiff identified in his interrogatory responses [Motion, Exh. D] is the amount he hoped to earn as a state legislator for an eight-year period, assuming he

---

[6]        Plaintiff argues that Attorney Tyrrell's declaration is "obviously an attempt to submit an expert report" and should be stricken.  [Memo Contra at 5, 18-19.]  To the contrary, Attorney Tyrrell offered no expert opinions and does not purport to tell the Court what the law is.  He is offered solely as a fact witness.

had won election in 2018 and was re-elected three more times.  That's it!  He never disclosed information on any other component of damages, either in his initial disclosures under Rule 26(a)(1)(A)(iii), or in response to CA PAC's interrogatories or document requests.

Such damages are not available as a matter of law.  Plaintiff has no answer to the case law holding that candidates who lose an election cannot recover damages in tort based on having lost an election.  [Motion at 17-20.]  Plaintiff incorporated by reference his memo contra to CA PAC's recent motion to exclude his damages expert, but in that brief he likewise conceded he had no answer to this body of law.  We add that the short affidavit from Plaintiff that was attached to the prior memo contra contained *no information* about any amount of alleged damages under any theory.  In his discovery responses, Plaintiff also made a generic reference to reputational harm and stated he would supplement his response and provide supporting documentation.  He never did, and now it is too late.  "The nonmovant is not entitled to a trial on the basis of a hope that he can produce some evidence at that time."  Wright, Miller & Kane, Fed. Practice & Procedure § 2727.2, at 513 (2016 ed.).

## CONCLUSION

For the reasons set forth above and in the Motion, the Court should issue an order granting summary judgment to Defendant.

Respectfully submitted,

/s/ Christopher J. Hogan
Christopher J. Hogan (0079829), Lead Counsel
Marion H. Little, Jr. (0042679)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215-6101
Telephone: (614) 365-9900
hogan@litohio.com
little@litohio.com

Attorneys for Defendant
Conservative Alliance Political Action Committee

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 13, 2019, a copy of the foregoing was filed electronically with the Clerk of this Court using the CM/ECF system, which will send notification of such filing to the following:

David Horvath, Esq.
7100 E. Pleasant Valley Road, Suite 110
Independence, OH  44131

Attorney for Plaintiff

/s/ Christopher J. Hogan
Christopher J. Hogan (0079829)

1178-001:839257